UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

BOSTON DISTRICT

JOYCE ROWLEY,
PLAINTIFF, PRO SE

CASE NO. 21-CV-11649-FDS

V.

CITY OF NEW BEDFORD, MASSACHUSETTS
DEFENDANT

## Plaintiff's Reply to

## Preliminary Injunction for Asian Elephant Ruth

As the Court allowed Plaintiff Joyce Rowley to reply to Defendant City of New Bedford's response to her motion for a preliminary injunction, Rowley takes this opportunity to address the issues raised by Defendant.

Defendant City's response relies on two affidavits and an incomplete clinical record for Asian elephant Ruth. Although the response was filed on January 20, 2022, the records end on November 18, 2021. Attached are Ruth's clinical records from November 18, 2021 to January 20, 2022. (Exhibit 1). It appears that the pododermatitis is now affecting Digit 3. By December 7, 2021, that toe had a 7 cm long lesion.

No records were provided regarding Asian elephant Emily, although her medical condition, proliferative pododermatitis, is discussed in the affidavits.

None of the recent radiograph reports were submitted. No radiographs with annotations were submitted to support Defendant's claims that Ruth's left foot did not have osteitis, and that the two toe bones were gone as the radiologist first indicated.

## OBJECTIONS

The following objections are made to documents in the Defendant's Exhibits and references thereto, and Plaintiff asks the Court to strike them from the record.

Plaintiff objects to Dr. James Osterhuis' report and any references to it or conclusions drawn from it in the two affidavits and the Memorandum in Opposition as hearsay (Exhibit D).

Plaintiff objects to statements by Affiant Shara Crook regarding Michael McClure as hearsay (Crook Affidavit, 15, p. 12; 35, p. 14).

Plaintiff objects to Ms. Crook's testimony as to the accuracy of the City veterinarian's statements, as Ms. Crook is not qualified to do so, particularly with regard to weight loss causation or bloodwork inflammatory markers (Id. 26, p. 13; 33, p. 14; 24, p. 18). Plaintiff also objects to Ms. Crook's testimony regarding a medical diagnosis regarding Ruth's pododermatitis for the same reason (Id. 37:3, 37:4, 37:5, p. 15). Likewise, Plaintiff objects to Ms. Crook's statements on pages 21 - 25 regarding the veterinarian's diagnosis, as she is not qualified to make those claims.

Plaintiff objects to all affiant responses to the Amended Complaint in both affidavits as an Answer has not yet been filed. To the extent their testimony on the Amended Complaint is accepted, Plaintiff objects as follows:

Plaintiff objects to Ms. Crook's statement regarding the conclusions of various consultants on August 27, 2021 as hearsay (Id., 29, p. 14) and to her responses to the Amended Complaint that references "multiple consultants' " opinions as to the cause of the elephants' pododermatitis (p. 15), as hearsay.

Plaintiff objects to statements by Affiant Dr. Erica Lipanovich regarding conclusions by multiple consultants regarding the cause of the elephants pododermatitis as hearsay (8:2, p. 71).

Plaintiff objects to the balance of Dr. Lipanovich's statements regarding the exhibit and elephant management as she is unqualified to make those statements.

Plaintiff objects to Dr. Lipanovich's affidavit as it appears this affidavit is identical to Ms. Crook's affidavit, including #25, that states: "...Director Lovett, Dr. Lipanovich and I..." (p. 75). It is doubtful Dr. Lipanovich read what she was signing.

**Factual errors**

Defendant accuses Plaintiff Rowley of misinterpreting the text on pododermatitis, insists that pododermatitis is not infectious and cannot spread. Besides being counterintuitive, those claims are simply wrong. Below is the full

text in question:

> "**Pododermatitis**. The term pododermatitis is used to describe any infectious process of the foot, which may be as simple as a localized abscess or as complex as a generalized infection in and around the nails or in pockets within and beneath the sole (Fig. 20.12). A severe infection may spread to involve the bones and joints of the foot, producing septic osteitis and arthritis. A serious consequence is infection of the digital cushion.
> 
> *Predisposing factors include neglect of regular nail and sole trimming, constant exposure to <u>filth and moisture</u> and lack of routine inspection of the undersurface of the foot. Sedentary elephants are more likely to develop foot infections than active elephants.* Elephants with conformational faults tend to develop foot problems as they begin to age (30–40 years) because they walk in such a manner that unequal weight is distributed to unaffected limbs.
>
> Fowler, M., Mikota, S.M., Biology, Medicine & Surgery of Elephants, 2006. P. 277, Foot Disorders, *Infectious diseases of the skin of feet*. Emphasis added.

Conformational issues, though a factor, are not the primary cause. See also: Fowler's description of Krueger National Park, South Africa, wild elephants that contracted pododermatitis at a watering hole (Id. 278). For Ruth, the pododermatitis caused her left foot to rotate almost 90°. Exhibit 2, Photos of Ruth's feet 2018 and November 2021.

Nor is that the only text to emphasize exercise and clean living quarters as preventive medicine. From <u>The Elephant's Foot: Preventive Care of Foot

Conditions in Captive African and Asian Elephants (Csuti, Blair, et al, Iowa State University Press, 2001):

> "The take home message presented in this book is that foot problems in elephants are preventable, and prevention is highly preferable to treatment. Lack of exercise, long hours standing on hard substrates, and wound contamination from standing in their own excreta are major contributing factors to many elephant foot problems."
> *Reviewed by:* Ned Gentz, MS, DVM, DACZM, Albuquerque Biological Park, Albuquerque, NM 87102, USA

The Defendant claims there was no infection in Ruth's foot, that pododermatitis is not infectious and could not spread (Defendant's Memorandum, p. 4) but then boasts that Ruth was on three different antibiotics as a sign she was well cared for.

As a first issue, Dr. Lipanovich did acknowledge the likelihood of infection on August 3, 2021 (Def. Ex. G, p. 199 "Culture results show three different types of organisms. All three with a varying range of sensitivities. Enrofloxacin appears to be adequate for two of them and topical excede:gentamicin should be adequate to help with the last organism."). Also, the diagnoses for active problems that day was "proliferative pododermatitis/canker" for both the left and right front feet (Id. P. 198). Canker is defined as "A condition characterized by a chronic, moist pododermatitis. Commonly manifested as a generalized infection at the skin and

sole junction as a pododermatitis." (Fowler & Mikota, p. 501).

As to antibiotics causing Ruth's poor body condition, Ruth's 532-pound weight loss occurred over the course of two years, with 332 lbs. occurring before Ruth began antibiotics in July 2021. Therefore attribution of Ruth's weight loss to antibiotics is incorrect.

But weight is only one metric of poor body condition. The clinical notes for Ruth's annual exam on January 13, 2021 indicates a poor body condition ranking as "BCS 5/9." Yet nothing was done to improve her body condition. (Def. Ex. G, p. 324)

Defendant City could not provide any scientific literature that stall rest should be used in elephant foot care or specifically for pododermatitis. Conditions in the barn are indeed "fetid."

As seen in this screenshot of the interior of the barn prior to the installation of bars, the dung and urine accumulate overnight. Exhibit 4, Barn conditions c. 2016. Ruth and Emily walk, stand, sleep and dust in their own waste for at least 16 hours each day. That's two-thirds of their lives, or at least 25 of the last 35 years they spent in the barn. Until 2012, the concrete floor could be powerwashed. After the floor was replaced with soil, the elephants could avoid their waste. With the installation of steel bars around the stalls, they could no longer avoid their waste.

The solids may be removed during the day, but liquids and some of the solid excreta travels into the soil. That material is rotated outside where the elephants use it for dusting. Ruth has been more affected because she has been forced to stand on the inner yard where the rotated waste-contaminated soil is dumped. Exhibit 5, Photos of rotated soil spread at the inner yard shade structure.

Despite the Defendant's statements to the contrary, the Zoo Elephant Management Policy clearly states that the elephants are controlled with 43 commands, including "Stay." (Exhibit 6, Buttonwood Park Zoo Elephant Management Policy, p. 14). Nor did Defendant's response address Ruth's behavior as seen in the video referenced in the memorandum for the preliminary injunction. Plaintiff notes in her affidavit that she had not seen Ruth behave with total immobility or turn away from food without finishing in the nine years prior (Rowley Affidavit, #12, p. 4).

Plaintiff's affidavit also addresses various claims about Plaintiff's qualifications (Rowley Affidavit). Most importantly, Plaintiff was assisted by a board-certified veterinarian who helped interpret the elephants' clinical records for the past five years, and who had reviewed their records back to 2005 to familiarize herself with their past health issues.

Additionally, in 2015, Plaintiff brought Dr. Phillip K. Ensley, DVM to the Zoo for a three-day assessment. Dr. Ensley has over 45 years experience with

elephants and provided sworn testimony on African elephant Nosey to the USDA, on the Ringling Bros Barnum & Bailey circus (<u>ASPCA, et al., v. Feld Entertainment</u>, 659 F.3d 13 (2011)), on Asian elephant Billy at the LAZoo (<u>Robert Culp, et al., v. City of Los Angelos, et al.</u>, Court of Appeals of California, Second Appellate District, Division Eight, September 23, 2009),  and on Asian elephant Lucky at the San Antonio Zoo (<u>Graham v. San Antonio</u>, 261 F Supp. 3d, 2016). Zoo director Keith Lovett refused to let Dr. Ensley examine Ruth, although he was provided with his curriculum vitae well in advance.  Exhibit 7, Email exchange with Keith Lovett, April 5, 2015.

## Legal Framework

<u>I. Likelihood of success</u>. Regarding the first prong of the Court's preliminary injunction four-part test, Defendant states that Plaintiff has not provided "qualified veterinarian" testimony regarding Ruth's condition, and so won't be successful on the merits of the case. Their call for pre-qualifying Plaintiff's consultant was simply an obstructionist tactic to prevent Plaintiff's success.

As Defendant well knows, Plaintiff has made multiple attempts to perform a pre-recorded video health assessment for two months. Defendant stalled every attempt to perform the necessary health assessment, including Plaintiff's attempt to have access to an existing video system in the elephant barn under a motion to compel. As she explained, that information on Ruth's mobility during

confinement would help inform the veterinarians, as well as determine what was causing overnight injuries.

Far from failing to assess risks associated with transporting lame, older elephants, Plaintiff sought experts who routinely do so. Likewise, the facility that has agreed to accept Ruth is run by staff with decades of experience in elderly elephant management and foot care. (Exhibit 8, Carol Buckley Affidavit). Most, if not all, of the 23 elephants brought to The Elephant Sanctuary in Tennessee under Ms. Buckley's leadership were sick, elderly, and had foot problems.

Despite Defendant's glowing terms for Ruth's living conditions, the fact remains that the barn roof leaks and was not repaired for two years. Claims that the waste is removed daily fails to recognize that the elephants generate the waste overnight while the keepers are gone. Ruth and Emily must stand, walk, sleep and eat amid considerable waste.

As for the zoo keepers' longevity, only one keeper has been employed 20 years; the others' time of employment are: 11, 7, 4, and 1 years for an average of 8.6 years. Additionally, the elephants have seen another seven keepers come and go.

2. <u>Irreparable harm.</u> In its analysis of the second prong, the Defendant used the test for legal standing instead of preliminary injunctions, stating Plaintiff must prove she is irreparably harmed. (Def. Memorandum, 7, citing <u>Animal</u>

Welfare Institute, et al., v. Martin, et al., 623 F.3d 19, 27 (1st. Cir 2010). The First Circuit in AWI properly considers the harm to lynx as a species if the preliminary injunction against trapping was not granted. At no time did the circuit court require AWI to show it was harmed irreparably after the initial test for standing, but instead were required to show that lynx, as a species, would be irreparably harmed.

As for the third and fourth prongs of the test, the First Circuit in AWI said:

> "...this circuit's law has incorporated Congress's prioritization of listed species' interests into the third and fourth prongs of the analysis, modifying those factors where appropriate to "tip[] heavily in favor of protected species...' " citing Coxe, 127 F.3d at 160 (quoting Nat'l Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508, 1510 (9th Cir.1994))

Defendant's rather exaggerated claims of public interest and loss to the Zoo notwithstanding, the balance tips in favor of Ruth, whose time at the zoo has already cost her so much. Her chances of surviving another two or three years as a "beloved" member of the Zoo are not good. Her chances improve if she is relocated to a warm climate where she can get exercise in fresh air on acres of pasture and forests, and live in a newly built modern, clean barn.

## Conclusion

Plaintiff asks that the relief requested be granted, for Ruth's sake. 35

years has taken its toll on her. The harm to her is clear. This latest insult to her body was preventable, was painful, and left her permanently lame. If, as Defendant claims, she is loved by the community, they will let her go and help ensure her trip is a safe one.

Respectfully submitted,
/S/Joyce Rowley
Plaintiff pro se
Po Box 50251
New Bedford, MA 02745
Ph: 508-542-8297