UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOYCE ROWLEY, )<br><br>Plaintiff, )<br><br>v. )<br><br>CITY OF NEW BEDFORD,<br>MASSACHUSETTS, )<br><br>Defendant. ) | Civil Action No.<br>21-11649-FDS |

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND
<u>PERMANENT INJUNCTION</u>

SAYLOR, C.J.

Plaintiff Joyce Rowley has brought this action seeking declaratory and injunctive relief against the City of New Bedford, Massachusetts, which owns and operates a zoo where two Asian elephants reside. According to the complaint, the City is harming and harassing the elephants in violation of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. The complaint seeks, among other things, a declaration that the City's treatment of the elephants violates section nine of the ESA and an injunction permitting plaintiff to remove the elephants from defendant's care and transfer them to a sanctuary. Plaintiff is proceeding *pro se*.

At issue here are three motions filed by plaintiff that are, in substance, motions for a temporary restraining order, a preliminary injunction, and a permanent injunction. For the reasons set forth below, the motions will be denied.

## I.  Background

### A.  Factual Background

The Court relies on the parties' briefs, affidavits, and documentary evidence to decide the present motions.  Where noted, the Court also refers to the judgment in an earlier, related case between the same parties before District Judge William G. Young.  *See Rowley v. City of New Bedford, Massachusetts* (*Rowley I*), 413 F. Supp. 3d 53 (D. Mass. 2019), *aff'd*, 2020 WL 6111190 (1st Cir. Sept. 24, 2020).[1]

#### 1.  The Parties

Joyce Rowley is a resident of New Bedford and a member of the Buttonwood Park Zoological Society.  (Am. Compl. at 2).  She visits "Emily" and "Ruth," the two Asian elephants who are the subject of this litigation, "on a daily basis, often spending one to two hours with them."  (*Id.*).  According to the complaint, the conditions in which the elephants live affect her "aesthetically, emotionally, and spiritually."  (*Id.*).

The City of New Bedford (the "City") is a municipality that owns and operates the Buttonwood Park Zoo where Emily and Ruth reside.  (Def.'s Answer at 2).  The elephant exhibit at the zoo is approximately 20,000 square feet.  (*Id.* at 3).

#### 2.  The Elephants

Asian elephants are an endangered species.  *See* 50 C.F.R. § 17.11(h); *see also* 41 Fed. Reg. 24062, 24066 (June 14, 1976).  Emily, the larger of the two elephants at the Buttonwood Park Zoo, is approximately 58 years old and was acquired by the City in 1968.  (*See* Am. Compl. ¶ 44).  Ruth is several years older than Emily and was first brought to the zoo in 1986.  (*See id.*

---

[1] Judge Young addressed the same legal issues in the related case as those at issue in the present action. Accordingly, the Court will incorporate parts of his prior opinion for the convenience of the reader.

¶¶ 23-24).[2]

### B.      The Related Case

On September 21, 2017, plaintiff filed a complaint for declaratory and injunctive relief against the City of New Bedford.  ("*Rowley I*").[3]  As amended, the complaint asserted that the City was harming and harassing Emily and Ruth in violation of the ESA by failing to provide adequate shelter (Count 1), adequate space (Count 2), and adequate social opportunities (Count 3); by failing to prevent Ruth from being attacked by Emily (Count 4); by failing to provide adequate veterinary care (Count 5); and by failing to provide proper feeding and adequate enrichment (Count 6).  (*Rowley I*, Am. Compl. ¶¶ 104-30).[4]

After a three-day bench trial in March 2019, Judge Young concluded that the City had not violated the ESA.  *See Rowley I*, 413 F. Supp. 3d at 67.  The court held that the City had provided care that complied with the Animal Welfare Act and generally accepted veterinary practices, and had neither harmed nor harassed the elephants; that the food and shelter provided by the City was consistent with generally accepted animal-husbandry practices and did not harm or harass the elephants; that there was insufficient evidence to establish the likelihood of a significant disruption of normal behavioral patterns; and that plaintiff had not proved that the City harmed or harassed Ruth by negligently allowing Emily, the larger of the two elephants, to attack her.  *Id.* at 64-67.

---

[2] The amended complaint, which was filed in December 2021, lists Ruth as 60 years old.  (Am. Compl. ¶ 23).  Judge Young, however, had found in September 2019 that Ruth was then approximately 61 years old.  *See Rowley I*, 413 F. Supp. 3d at 61.

[3] The docket number for the related case is 17-cv-11809-WGY.

[4] The amended complaint also sought a declaratory judgment stating that the City's treatment of the two elephants violated section nine of the ESA (Count 7).  (*Rowley I*, Am. Compl. ¶ 134).

### C.    Procedural Background

Approximately two years after judgment entered for the City in *Rowley I*, plaintiff

commenced the present action ("*Rowley II*"), alleging that there had been "substantial changes"

at the zoo since 2019.  (*See* Am. Compl. at 1).[5]  Specifically, the amended complaint asserts that

the facilities housing the elephants have become "dilapidated" and that the management of the

facilities and elephants has changed, resulting in the elephants developing pododermatitis, a

painful foot disease.  (*Id.*).  It further alleges that since the judgment in *Rowley I*, Ruth has lost

significant weight, and has been restricted from moving, eating, and drinking.  (*See id.* ¶¶ 24-25).

As in *Rowley I*, it asserts violations of the ESA and seeks declaratory and injunctive relief.  (*See

id.* ¶¶ 77-84).[6]

On November 12, 2021, plaintiff filed a motion for a preliminary injunction, which the

Court denied on February 10, 2022.  (*See* ECF 9, 33).[7]

On September 28, 2022, plaintiff filed a motion for a permanent injunction concerning

both elephants and a temporary restraining order concerning Ruth.  (ECF 77).  The next day,

---

[5] Because more than two years had elapsed between the closing of *Rowley I* (October 4, 2019) and the filing of *Rowley II* (October 8, 2021), the matter was not assigned to Judge Young as a related case under Local Rule 40.1(g)(4).

[6] Specifically, the amended complaint seeks a judgment (1) declaring that defendant's treatment of both elephants violates the Endangered Species Act; (2) enjoining defendant from euthanizing either elephant; (3) enjoining defendant from continuing to violate the ESA; (4) enjoining defendant from continuing to possess either elephant; (5) enjoining defendant from transferring either elephant to the Buttonwood Park Zoological society, or to any other public or private zoo; (6) allowing plaintiff's veterinarian(s) to inspect both elephants in the barn; (7) transferring both elephants to plaintiff to be transported to an elephant sanctuary; (8) awarding transport costs to plaintiff; (9) allowing plaintiff to attend the necropsy and awarding plaintiff either elephant's remains should either die at the zoo; and (10) granting any other relief as may be equitable.  (Am. Compl. ¶ 84).

[7] Plaintiff's first motion for a preliminary injunction sought to (1) prohibit defendant from euthanizing Ruth; (2) prohibit defendant from restricting Ruth's freedom of movement, ability to graze, or ability to drink; (3) permit plaintiff's independent veterinarian to examine and assess Ruth, and to make changes to her food, medications, and treatments in order to "ready her for transport"; (4) prohibit defendant from transferring either elephant to a third party to avoid litigation; (5) transfer Ruth to an "appropriate" non-zoo facility of plaintiff's choice; (6) prohibit defendant from interfering with the transport team in any way; and (7) temporarily award custody to plaintiff's chosen facility.  (*See* ECF 9 at 1-2).

plaintiff filed a substantively identical motion.  (ECF 80).[8]  On October 11, 2022, plaintiff filed

an additional motion for a temporary restraining order.  (ECF 84).[9]

Collectively, plaintiff's motions for a temporary restraining order request (1) that Ruth be

allowed out of the elephant barn by 9 a.m. each morning, weather permitting; (2) that Ruth be

provided overnight access to the yard on alternating nights with Emily, weather permitting; (3)

that Ruth not be "cued" to stand still or be prohibited from moving freely around the elephant

exhibit and into or out of the barn; (4) that Ruth not be restricted from eating or drinking at any

time and that she be fed as frequently as Emily; (5) that the elephant foot "trimmer" used by

defendant be prohibited from trimming Ruth's feet; (6) that plaintiff be provided overnight

access to the elephant-barn cameras; (7) that defendant be prohibited from euthanizing Ruth; (8)

that defendant be prohibited from transferring either elephant to a third party in order to avoid

litigation; (9) that defendant be prohibited from restricting Ruth's freedom of movement through

"stall rest"; (10) that an independent veterinarian acting on plaintiff's behalf be permitted to

examine Ruth and assess her health; and (11) that plaintiff be permitted to transfer Ruth to a non-

zoo elephant facility should plaintiff's veterinarian conclude that Ruth should be removed from

defendant's care.  (*See* ECF 84 at 2-3).

## II.     Legal Framework

### A.     The Endangered Species Act

Congress enacted the Endangered Species Act, 16 U.S.C. §§ 1531-1544, in December

---

[8] The amended motion corrected certain typographical errors in the first motion.

[9] On November 27, 2022, plaintiff filed a motion to expedite her October 11, 2022 motion for a temporary restraining order.  (*See* ECF 91).  On February 27, 2023, she filed an additional motion "request[ing] that the Court issue her motion for a temporary restraining order against the City of New Bedford and grant the permanent injunction without further notice."  (ECF 105 at 1).  In that motion, she further requested that "should Asian elephant Ruth die, [p]laintiff be permitted to collect evidence by viewing and photographing her remains prior to a necropsy and burial."  (*Id.* at 3).

1973.  Pub. L. No. 93-205, 87 Stat. 884 (Dec. 28, 1973).  The purpose of the ESA is to (1) "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," (2) "provide a program for the conservation of such endangered species and threatened species," and (3) take appropriate steps to carry out the commitments of the United States in various international treaties and conventions concerning species conservation.  16 U.S.C. § 1531(b).

Section nine of the ESA makes it illegal for any individual to "take" any endangered species.  16 U.S.C. § 1538(a)(1)(B).  The Supreme Court has emphasized that Congress intended the word "take" to cover "every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife."  *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995) (quoting S. Rep. No. 93-307, at 7 (1973)).  Section nine thus reaches "more than the deliberate actions of hunters and trappers."  *Id.* at 705.

The ESA itself defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Here, plaintiff's claims rely on the prohibition on harassing and harming endangered species.  (*See* Am. Compl. ¶¶ 63-75).

The Fish and Wildlife Service, the agency within the United States Department of the Interior tasked with implementing the ESA, *see* 16 U.S.C. § 1537a(a), has promulgated regulations defining the terms "harm" and "harass" under the statute.

Under those regulations, the term "harm" is defined (as part of the definition of "take" in the ESA) to mean:

> [A]n act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3; *see also Babbitt*, 515 U.S. at 703 (deferring to regulation's interpretation of

"harm") (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

The term "harass" is defined (again, as part of the definition of "take") to mean:

> [A]n intentional or negligent act or omission which creates the likelihood of
> injury to wildlife by annoying it to such an extent as to significantly disrupt
> normal behavioral patterns which include, but are not limited to, breeding,
> feeding, or sheltering.

50 C.F.R. § 17.3.  That definition includes a carve-out that exempts the following:

> generally accepted:  (1) [a]nimal husbandry practices that meet or exceed the
> minimum standards for facilities and care under the Animal Welfare Act, (2)
> [b]reeding procedures, or (3) [p]rovisions of veterinary care for confining,
> tranquilizing, or anesthetizing, when such practices, procedures, or provisions are
> not likely to . . . result in injury to the wildlife.

*Id.*

**B.      The Animal Welfare Act**

Before the enactment of the ESA, Congress enacted the Animal Welfare Act, 7 U.S.C. §§

2131-2159, Pub. L. No. 89-544, 80 Stat. 350 (Aug. 24, 1966).  The statute has the following

goals:

> (1) to insure that animals intended for use in research facilities or for exhibition
> purposes or for use as pets are provided humane care and treatment; (2) to assure
> the humane treatment of animals during transportation in commerce; and (3) to
> protect the owners of animals from the theft of their animals by preventing the
> sale or use of animals which have been stolen.

*Id.* § 2131.

Congress charged the United States Department of Agriculture ("DOA") with enforcing

the statute.  *Id.* §§ 2132(b), 2133, 2146.  To implement its protections, the DOA promulgates

regulations that set standards for facilities and care of animals in captivity.  *See, e.g.*, 9 C.F.R. §§

3.125-3.142 (setting standards for the "handling, care, treatment, and transportation of

warmblooded animals other than dogs, cats, rabbits, hamsters, guinea pigs, nonhuman primates,

and marine mammals").  It enforces those standards through licensing and compliance inspections.  *See* 7 U.S.C. § 2146(a).  Unlike the ESA, the Animal Welfare Act does not include a citizen-suit provision.  *See Graham v. San Antonio Zoological Soc'y*, 261 F. Supp. 3d 711, 737 (W.D. Tex. 2017).

### C.      The Interplay between the ESA and the AWA

Because defendant is engaged in "animal husbandry practices" with "animals intended . . . for exhibition purposes," *see* 7 U.S.C. § 2131, the Animal Welfare Act exclusion applies to plaintiff's harassment claims.  Courts in multiple cases have grappled with the interplay between the requirements of the Animal Welfare Act and the "taking" prohibition of the ESA.  *See Graham*, 261 F. Supp. 3d at 739-43 (collecting cases).

The general consensus among these courts is that the regulations promulgated by the DOA pursuant to the Animal Welfare Act are the substantive standards by which a court should assess harassment-based "taking" claims under the ESA.  *See id.* at 745.  The findings of past inspections by the Animal and Plant Health Inspection Service ("APHIS"), the agency within the DOA charged with enforcing the Animal Welfare Act, are relevant to a court's assessment of whether an entity has violated that Act.  They are not, however, dispositive.  *See id.* at 745-46.

The District Court for the Western District of Texas described the role of APHIS assessments as follows:

> APHIS determinations of past and present violations (or a lack thereof) are certainly evidence of [a harassment finding under the Endangered Species Act], but are neither necessary to support nor sufficient to warrant such a finding. Thus, the regulatory definition of "harass," by excluding animal husbandry practices that comply with the [Animal Welfare Act], does not permit a finding of no liability simply because of a previous determination of no [Animal Welfare Act] violation; instead, it substitutes the compliance standards of the [Animal Welfare Act] as the substantive standard for whether an Endangered Species Act violation has occurred, and requires such a determination to be made through the typical adversarial process.

*Id.* at 745.  The court in *Graham* concluded that a claim that a zoo has violated the ESA by "harassing" a captive endangered species requires the court to determine, first, if the zoo's practices are generally accepted, and, second, whether the zoo's practices comply with the governing Animal Welfare Act regulations.  *Id.* at 745-46.  "The burden is on the plaintiffs to show that the Animal Welfare Act's minimum standards were not met."  *Id.* at 741 (citing *Kuehl v. Sellner*, 161 F. Supp. 3d 678, 718 (N.D. Iowa 2016); *Hill v. Coggins*, 2016 U.S. Dist. LEXIS 42374, at *31-32 (W.D.N.C. Mar. 30, 2016)).  The *Graham* court held that it was to undertake this inquiry independently—considering, but not simply deferring to—any prior findings by the APHIS.  *Id.* at 745-46.

The court in *Graham* further held that "whether the Zoo committed a [taking] under the Endangered Species Act by 'harming' [a captive elephant] is a separate legal issue requiring a separate analysis of the facts, and is not at all dependent on [Animal Welfare Act] compliance."  *Id.* at 728, 746-48 (citing *Kuehl*, 161 F. Supp. 3d at 715-16; *Hill*, 2016 U.S. Dist. LEXIS 42374, at *31-32).

In *Kuehl v. Sellner*, the District Court for the Northern District of Iowa found after a bench trial that the defendants, a family-run zoo and its owner-operators, had violated the ESA by harassing captive lemurs and both harming and harassing captive tigers.  161 F. Supp. 3d at 718.  The court's determination that the defendants had harassed the lemurs and tigers was based on an evaluation of the zoo's compliance with the substantive standards in the implementing regulations of the Animal Welfare Act.  *Id.* at 710-18.  While some of the conduct that the court found to constitute harassment had previously been subject to penalties by the APHIS for non-compliance, the court also found harassment in certain conduct that the APHIS had not found to violate regulations under the Animal Welfare Act.  *Id.*  For example, relying on the plaintiffs'

expert witness, the court found that the social isolation of the lemurs disrupted their behavioral patterns and thus constituted a "taking" under the ESA (even though the APHIS had not previously sanctioned the defendants for any conduct related to the animals' social isolation).  *Id.* at 710-11.

In *Hill v. Coggins*, the District Court for the Western District of North Carolina found after a bench trial that the plaintiffs had failed to demonstrate that the defendants, owners and operators of the Cherokee Bear Zoo, had harmed or harassed captive grizzly bears pursuant to the ESA.  2016 U.S. Dist. LEXIS 42374, at *37-38.  In so finding, the court relied on the fact that the plaintiffs had failed to show any evidence of instances in which the zoo's treatment of the grizzly bears had violated any Animal Welfare Act regulations governing animal treatment. *Id.* at *33-34.  The court did not analyze separately whether the defendants' practices were also generally accepted animal-husbandry practices, however.  *See id.*; 50 C.F.R. § 17.3.  On appeal, the Fourth Circuit addressed that error, clarifying that the exclusion in the definition of "harass" in the Fish and Wildlife Service regulations requires that the practice be *both* (1) "generally accepted" and (2) compliant with the Animal Welfare Act to withstand scrutiny under the ESA. *Hill v. Coggins*, 867 F.3d 499, 509-10 (4th Cir. 2017).

The District Court for the Southern District of Florida in *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium* granted summary judgment for the Miami Seaquarium, concluding that the plaintiff had introduced no evidence that the captive killer whale's living conditions "gravely threaten[ed]" her existence, and cast some doubt on the applicability of the ESA to endangered species in captivity.  189 F. Supp. 3d 1327, 1355 (S.D. Fla. 2016).  As the court in *Graham* subsequently noted, that "gravely threatening" standard is not found in the ESA or Animal Welfare Act or regulations implementing those statutes, and "was created—without

citation—by the *PETA* court." *Graham*, 261 F. Supp. 3d at 743 (discussing *Miami Seaquarium*, 189 F. Supp. 3d at 1351). The Eleventh Circuit affirmed the grant of summary judgment in *Miami Seaquarium*, holding that—while it may not require a grave risk of death—"harassment" and "harm" under the ESA require a "threat of serious harm." *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1144, 1147-50 (11th Cir. 2018) (per curiam).[10]

In a case involving the Tri-State Zoo in Maryland, the complaint alleged that the zoo housed lemurs, tigers, and a lion in an inappropriate social setting; failed to provide adequate enrichment to lemurs, tigers, and a lion; failed adequately to protect lemurs, tigers, and a lion from the elements; and failed to provide adequate veterinary care to a lion. *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 2018 U.S. Dist. LEXIS 6638, at *1-5 (D. Md. Jan. 16, 2018). The district court ruled that the complaint plausibly stated a claim for a harassment- or harm-based "taking" violation of the ESA. *Id.* at *15-18.[11] The court later granted partial summary judgment in favor of the plaintiff, 2019 U.S. Dist. LEXIS 112366, at *1 (D. Md. July 8, 2019), ruling that "the zoo unlawfully took Cayenne," a tiger, through a "lack of basic veterinary care." *Id.* at *18-19.

In sum, and as relevant here, if any of defendant's intentional or negligent conduct "creates the likelihood of injury to [the elephants] by annoying [them] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding,

---

[10] The *Miami Seaquarium* case analyzed the living conditions of marine mammals, which are regulated by the National Marine Fisheries Service, rather than the Fish and Wildlife Service. *See* 189 F. Supp. 3d at 1333.

[11] The *Tri-State* court rejected the reasoning of the *Miami Seaquarium* court on the potential conflict between the ESA and the Animal Welfare Act as to an endangered species in captivity. *See Tri-State*, 2018 U.S. Dist. LEXIS 6638, at *11-14. That court noted that the logic of the *Miami Seaquarium* decision represented a minority view among district courts to have addressed the issue, and one that the Fourth Circuit later repudiated in *Hill v. Coggins*, 867 F.3d at 510. *Tri-State*, 2018 U.S. Dist. LEXIS 6638, at *11-14.

feeding, or sheltering," that conduct constitutes a "taking" of wildlife and violates the ESA—

unless the conduct is a generally accepted animal-husbandry practice and complies with the

Animal Welfare Act. *See* 50 C.F.R. § 17.3. In addition, defendant has committed a "taking" if

its conduct "actually kills or injures" the elephants. *See id.*

## III.   <u>Preliminary Injunction</u>

### A.   <u>Legal Standard</u>

To issue a preliminary injunction under Fed. R. Civ. P. 65, a district court must find that

the moving party has established (1) a likelihood of success on the merits, (2) a likelihood of

irreparable harm absent interim relief, (3) that the balance of equities weighs in his favor, and (4)

that a preliminary injunction is in the public interest. *Voice of the Arab World, Inc. v. MDTV

Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citing *Winter v. Natural Res. Def.

Council, Inc.*, 555 U.S. 7, 20 (2008)). Of those factors, the likelihood of success on the merits

"normally weighs heaviest in the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562

F.3d 62, 66 (1st Cir. 2009); *see also New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287

F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on

the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the

remaining factors become matters of idle curiosity."). Furthermore, "[t]he burden of

demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely

upon the movant." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st

Cir. 2004). "Under the [Endangered Species Act], however, the balancing and public interest

prongs have been answered by Congress' determination that the 'balance of hardships and the

public interest tips heavily in favor of protected species.'" *Strahan v. Coxe*, 127 F.3d 155, 160

(1st Cir. 1997) (quoting *National Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th

Cir. 1994)).

The court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits."  *Rohm & Haas Elec. Materials, LLC v. Electronic Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010).  "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction."  *Boston Taxi Owners Ass'n v. City of Boston*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### B.    Analysis

To the extent that plaintiff's various motions seek a "protective order" or a temporary restraining order as to Ruth, the Court will deem those requests to be a motion for a preliminary injunction.[12]  For the reasons set forth below, that motion will be denied.

### 1.    Likelihood of Success on the Merits

As set forth below, plaintiff is not likely to succeed on the merits of her claim that defendant is harming or harassing, and therefore "taking," the elephants in violation of the ESA.

### a.    Whether Defendant has Significantly Disrupted the Elephants' Normal Behavioral Patterns

As noted, if any of defendant's intentional or negligent conduct "creates the likelihood of injury to [the elephants] by annoying [them] to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering," that conduct constitutes a "taking" and violates the ESA—unless the conduct is a generally accepted animal-husbandry practice and complies with the Animal Welfare Act.  *See* 50 C.F.R. § 17.3.

According to the amended complaint, defendant houses the elephants in facilities that

---

[12] To obtain the more "extraordinary relief of a temporary restraining order," as compared to a motion for a preliminary injunction, a party must allege "immediate and irreparable" injury or loss that will occur *before* the adverse party can be heard in opposition.  *Imasuen v. Winn Prop. Mgmt.*, 2013 WL 6859094, at *3 (D. Mass. Dec. 26, 2013); Fed. R. Civ. P. 65(b)(1)(A).  That situation is not applicable here, and indeed the Court heard arguments on plaintiff's motions.

significantly disrupt their normal behavioral patterns, including feeding and sheltering.  (*See* Am. Compl. ¶¶ 69, 75).[13]  The amended complaint further asserts that the conditions that led to both elephants' pododermatitis are not generally accepted animal-husbandry practices.  (*Id.* ¶ 62).

Plaintiff, however, is neither a zookeeper nor a veterinarian, and she has not submitted expert testimony to support her lay conclusion that defendant is significantly disrupting the elephants' normal behavioral patterns or that defendant's care of either elephant departs from generally accepted animal-husbandry practice.  On the contrary, the record currently before the Court suggests that after Judge Young entered judgment for the City in *Rowley I*, defendant has likely improved its elephant care program:  the zoo has, for example, replaced the barn's roof; introduced automated food dispensers; purchased a remote-camera system to monitor the elephants as needed; improved the radiant-heat system and testing for low temperatures; implemented overnight access to the habitats for the elephants based on weather conditions; acquired a portable digital x-ray system capable of radiographing elephants' feet; hired a new staff veterinarian and elephant keeper; and brought in an outside consultant to provide staff training concerning elephant foot care.  (ECF 22, Ex. C ¶ 9; ECF 86, Ex. F ¶ 7).

In addition, although not dispositive, USDA inspectors concluded on two separate occasions in 2021—and at least once in 2022—that the zoo was fully compliant with USDA regulations.  (*See* ECF 22, Ex. A (USDA report concerning July 2021 routine inspection of the zoo); ECF 22, Ex. B (USDA report concerning October 2021 "focused" inspection of the

---

[13] More specifically, the amended complaint and subsequent motions allege, in part, that defendant has failed to remove waste-contaminated soil from the elephants' barn, and that defendant has immobilized Ruth, in part by training her to stand still.  (*See, e.g.*, ECF 85 at 1).  Defendant has provided evidence tending to rebut these allegations.  (*See, e.g.*, ECF 86, Ex. F at 4 ("Waste-contaminated soil and sand are removed daily from inside the barn and surrounding yard.  Larger scale sand rotations and disposal are conducted on a regular basis."); *id.* at 5 ("There are no verbal or visual cues that would hold or force an elephant to remain still for hours at a time.")).  Defendant has also provided evidence that the barn roof—which had been leaking—was replaced in 2022, and that at no point during the roof replacement process were the elephants in contact with the water leaks.  (*See id.* at 3-4).

elephants and their facilities); ECF 86, Ex. A (USDA report concerning July 2022 re-licensing inspection)). The results of these inspections thus further undercut plaintiff's assertion that since the 2019 judgment in *Rowley I*, the elephants have begun receiving substandard care in violation of the ESA.

### b.     Whether Defendant has "Actually Injured" the Elephants

Plaintiff has likewise failed to produce sufficient evidence that defendant has actually injured either of the elephants.

According to the amended complaint, substandard care and poor living conditions have caused a series of injuries, including pododermatitis and osteitis. (*See, e.g.*, Am. Compl. ¶¶ 62, 70, 71, 74-75). Defendant, however, has submitted several affidavits and expert reports calling into question plaintiff's diagnoses, which are not supported by sworn expert testimony. For example, Shara Rapoza, the zoo's Assistant Director and Elephant Manager, attested that Mike McClure—an elephant foot trimmer who has conducted at least seven on-site foot evaluations of Ruth from 2021 to date—has stated that proliferative pododermatitis is an age-related change in elephants with poor conformation, and that Ruth's pododermatitis was likely exacerbated by changes to her gait from developing osteoarthritis. (*See* ECF 22, Ex. C ¶¶ 15, 20). At least two veterinarians who have examined Ruth have similarly concluded that her pododermatitis was the result of a severe conformational problem due to being pigeon-toed, and not substandard care. (*See* ECF 86, Ex. D ¶ 7 (affidavit of Dr. Michael Ryer); ECF 86, Ex. G at 2 (report of Dr. James Oosterhuis)). In addition, Dr. Ryer affirmed that Ruth was never diagnosed with sepsis osteitis. (*See* ECF 86, Ex. D ¶ 7).[14]

---

[14] Dr. Ryer, the zoo's consulting veterinarian, holds degrees in zoology, biology, and veterinary medicine. (*See* ECF 86, Ex. D ¶ 1). Prior to earning his veterinary degree, he worked with Emily and Ruth as a caretaker and zookeeper, and he affirmed that he has personally interacted with Emily and Ruth "hundreds of times over the past three decades." (*Id.* ¶ 3).

Evidence submitted by defendant also tends to cast doubt on plaintiff's remaining allegations of injuries allegedly caused by defendant's substandard care.  For example, in a memorandum in support of one of her motions, plaintiff contends—without providing any supporting expert affidavits or reports—that Ruth has suffered a new injury to her right rear foot and that she observed a "very large open wound" on Ruth's right cheekbone that appeared to be bleeding.  (*See* ECF 92 at 2).  Defendant, however, subsequently submitted a sworn affidavit by the zoo's elephant manager stating that the pictures that plaintiff submitted of Ruth's foot do not show signs of injury, but rather depict an animal in a "relaxed stance."  (*See* ECF 94, Ex. 1 ¶ 6). She further affirmed that what plaintiff identified as a wounded and bleeding cheekbone was instead temporary discoloration resulting from the staff's routine application of an ointment meant to guard against dry skin and chapping.  (*Id.*).

Other alleged injuries include claims that defendant's substandard care is causing both elephants to lose weight, and that Ruth has lost two toe bones in her left foot.  (*See, e.g.*, Am. Compl. ¶¶ 41, 71, 75).  As to those claims, too, defendant has introduced uncontested evidence casting doubt on plaintiff's conclusions concerning the nature and cause of the alleged injuries. (*See, e.g.*, ECF 22, Ex. C ¶ 74 (attesting that Ruth's weight changes were due to antibiotic use, not substandard care); *id.* ¶ 37 (attesting that Ruth has not lost any bones in her foot)).[15]

In sum, lacking expert testimony to support her claims, plaintiff has not produced sufficient evidence that defendant is likely harming or harassing the elephants in violation of the ESA.  Where, as here, a plaintiff fails to meet her burden to show a likelihood of success on the

---

[15] Shara Rapoza, the zoo's elephant manager, further attested that while septic osteitis was listed in an early report as a possible cause for what appeared to be some bone loss in Ruth's foot, later radiographs confirmed that the bones were still present, but hidden by dense tissue.  (*See* ECF 22, Ex. C ¶ 37).  As noted, Dr. Ryer, a licensed veterinarian, affirmed that Ruth has never been diagnosed with septic osteitis.  (*See* ECF 86, Ex. D ¶ 7).

merits, "failure to do so is itself preclusive of the requested relief."  *See Bayley's Campground, Inc. v. Mills*, 985 F.3d 153, 158 (1st Cir. 2021).  However, for completeness, the Court will consider the remaining factors, which also counsel against injunctive relief.

### 2.      Likelihood of Irreparable Harm Absent Interim Relief

Irreparable harm is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that [t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown."  *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (internal quotations and citations omitted).  "Irreparable harm most often exists where a party has no adequate remedy at law."  *Charlesbank Equity Fund II*, 370 F.3d at 162.

Here, plaintiff has not shown that she or the elephants are likely to suffer irreparable harm if defendant retains full control over the decisions concerning the elephants' care.  On the contrary, Dr. Oosterhuis, a veterinary elephant care specialist, specifically commended the zoo's staff for its care of both elephants.  (*See* ECF 86, Ex. G at 4 ("I commend the Elephant Care Staff on their dedication to give Ruth and Emily the best possible care that they can—both physical and mental.")).  This factor therefore weighs in favor of denying plaintiff's motion for a preliminary injunction.

### 3.      Balance of the Equities

The balance of equities also weighs in defendant's favor.  It is true that in the context of litigation under the ESA, Congress has determined that "the 'balance of hardships . . . tips heavily in favor of protected species.'"  *Strahan*, 127 F.3d at 171 (quoting *National Wildlife Fed'n*, 23 F.3d at 1510).  Here, however, it is far from clear that removing Ruth from a zoo regulated by the USDA—where she has a team of trained elephant experts to care for her— would best promote her health and safety.  On the contrary, after examining Ruth in August

17

2021, Dr. Oosterhuis concluded that Ruth should be kept at the zoo due to her medical issues, and that "[s]he is in no condition to be moved." (ECF 86, Ex. G at 5). That factor also weighs against issuing a preliminary injunction.

### 4.    Impact on the Public Interest

The final factor similarly weighs against an injunction. Plaintiff contends that the "public interest is not served by keeping sentient beings in conditions that are so unsanitary that they get open sores," and that "the misery and suffering of zoo and circus animals is not worth the misplaced enjoyment of a few who still pay to see such outdated venues." (*See* ECF 85 at 13-14). Again, this is an action under the citizen-suit provision of the ESA. 16 U.S.C. § 1540(g). That statute contemplates that endangered species may be kept in captivity. *See* 50 C.F.R. § 17.3 (excluding from the definition of "take," as "applied to captive wildlife," "generally accepted" husbandry practices satisfying Animal Welfare Act standards); 7 U.S.C. § 2131 (explaining that the Animal Welfare Act is designed "to insure that animals intended for . . . exhibition purposes . . . are provided humane care and treatment"). The reference standard for an endangered species in captivity does not require the least-restrictive environment or the most natural possible setting. Rather, it is generally accepted and appropriate animal husbandry. *See* 50 C.F.R. § 17.3. And as set forth above, plaintiff has not demonstrated a likelihood of success on her claim that defendant is providing either of its elephants substandard care.

In addition, as noted above, it is not clearly in the public interest to relocate an elderly elephant from the Buttonwood Park Zoo—which has been Ruth's home for more than 35 years, and which employs a team of animal-welfare experts to care for her—to a non-zoo facility that is not regulated by the USDA.

In summary, and for all of the foregoing reasons, plaintiff has not made the "clear showing" necessary to support the granting of her motion for a preliminary injunction. *See*

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (describing a preliminary injunction as "an extraordinary and drastic remedy").  Accordingly, the motion for preliminary injunction will be denied.

## IV.   Permanent Injunction

Plaintiff also seeks a permanent injunction that would remove both elephants from defendant's zoo.  (*See* ECF 80; ECF 81 at 2).  The standard for a permanent injunction is "essentially the same" as for a preliminary injunction with the exception that the plaintiff must show *actual* success, rather than a likelihood of success.  *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987); *see also Magriz-Marrero v. Union de Tronquistas de Puerto Rico, Loc. 901*, 933 F. Supp. 2d 234, 237 (D.P.R. 2013) ("[E]ntry of a permanent injunction was inappropriate where plaintiffs had not prevailed on the merits of their underlying claims through a jury trial or successful motion for summary judgment.").

At this stage of the litigation, plaintiff cannot demonstrate that she has obtained "actual success" on the merits of her case, and the Court will instead construe plaintiff's motion for a permanent injunction as a motion for summary judgment seeking permanent injunctive relief. For the reasons set forth below, that motion will be denied.

### A.   Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of

either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### B.  Analysis

Plaintiff is not entitled to summary judgment because she has not demonstrated that there is no genuine dispute as to any material fact.  As previously noted, the parties dispute whether defendant has disrupted the elephants' normal behavioral patterns and whether the zoo's animal-husbandry practices are generally accepted.  The parties further dispute the nature and cause of the elephants' alleged injuries, including whether Ruth's pododermatitis was caused by defendant's substandard care, or whether it is instead an age-related change that is being appropriately managed by defendant.  These are questions of fact that will require expert testimony to resolve, and the motion for summary judgment will therefore be denied.

## V.  Conclusion

For the foregoing reasons, plaintiff's motions for a temporary restraining order and a permanent injunction (ECF 77, 80, 84, and 105) are DENIED.  Plaintiff's motion to expedite the motion for a temporary restraining order (ECF 91) is DENIED as moot.

**So Ordered.**

                                    /s/ F. Dennis Saylor IV
                                    F. Dennis Saylor IV
Dated:  April 12, 2023             Chief Judge, United States District Court