UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ ) | | |
| JOYCE ROWLEY, ) | | |
| ) | | |
| **Plaintiff,** ) | | |
| ) | | **Civil Action No.** |
| **v.** ) | | **21-11649-FDS** |
| ) | | |
| CITY OF NEW BEDFORD, ) | | |
| MASSACHUSETTS, ) | | |
| ) | | |
| **Defendant.** ) | | |
| _____ ) | | |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION
FOR DIRECTED VERDICT AND PARTIAL FINDINGS OF FACT AND
CONCLUSIONS OF LAW UNDER RULE 52(c)**

SAYLOR, C.J.

This is an action brought under the citizen-suit provision of the Endangered Species Act

("ESA").  Plaintiff Joyce Rowley is a resident of New Bedford, Massachusetts, and a member of

the Buttonwood Park Zoological Society.  The City of New Bedford (the "City") is the

municipality that owns and operates the Buttonwood Park Zoo.  The subjects of the lawsuit are

"Ruth" and "Emily," two Asian elephants at the zoo.

Plaintiff brought this action for declaratory and injunctive relief against the City on

October 8, 2021.  She contends the City is harming and harassing the elephants in violation of

the ESA, and seeks, among other things, an injunction permitting her to remove the elephants

from defendant's care and transfer them to a sanctuary in Tennessee or Georgia.  She is

proceeding *pro se*.

This is plaintiff's second effort at removing the elephants from the zoo.  On September

21, 2017, she filed a complaint in this court seeking declaratory and injunctive relief against the

City.  The case involved the same parties and the same legal issues as those involved in the present action.  The case proceeded to a bench trial before United States District Judge William G. Young, and he entered a final judgment on the merits in favor of the City on September 24, 2019.  *See Rowley v. City of New Bedford, Massachusetts* (*Rowley I*), 413 F. Supp. 3d 53 (D. Mass. 2019), *aff'd*, 2020 WL 6111190 (1st Cir. Sept. 24, 2020).

Judge Young's decision, which was affirmed on appeal, has preclusive effect, preventing plaintiff from re-litigating issues that were raised, or should have been raised, in that proceeding.  Accordingly, the only issues presented here are whether the City has harmed or harassed the elephants, within the meaning of the ESA, since September 2019.

The Court held a three-day bench trial on those issues in May 2024.  At the conclusion of plaintiff's evidence, the City moved for a directed verdict in its favor.

Plaintiff's evidence at the trial was directed in large part to proving that as a general matter elephants should never be held in captivity in zoos, and that therefore Ruth and Emily would be better off in a sanctuary.  Whatever the merits of that position, that is not what the ESA requires.  Zoos have their flaws, certainly, but they also provide substantial conservation and educational benefits to the public.  Whether elephants should not be held in zoos, or only in certain types of zoos, or whether zoos should be abolished altogether, are questions that are properly committed to the legislative and political processes.

Plaintiff also contended that one of the elephants, Ruth, was suffering from certain physical and other issues as a result of the conditions at the zoo.  She did not, however, offer any expert veterinary or other evidence as to either the existence of those conditions or their cause.

The only substantive question for this Court is to decide, under the ESA, whether the City complies with generally accepted husbandry practices.  Because plaintiff failed to offer any proof

that the City does not, a directed verdict for defendant—or, more accurately, a judgment under Rule 52(c)—is appropriate.

Accordingly, and for the reasons set forth below, defendant's motion will be granted.

## I.      Background

### A.      Background from *Rowley I*

On September 21, 2017, plaintiff filed a complaint for declaratory and injunctive relief against the City of New Bedford.  ("*Rowley I*").[1]  As amended, the complaint asserted that the City was harming and harassing Ruth and Emily in violation of the ESA by failing to provide adequate shelter (Count 1), adequate space (Count 2), and adequate social opportunities (Count 3); by failing to prevent Ruth from being attacked by Emily (Count 4); by failing to provide adequate veterinary care (Count 5); and by failing to provide proper feeding and adequate enrichment (Count 6).  (*Rowley I*, Am. Compl. ¶¶ 104-30).[2]  The court held a three-day bench trial in March 2019.

#### 1.      Findings of Fact in *Rowley I*

The court in *Rowley I* examined conditions at the zoo from 1968 until 2019.  In doing so, it made the following relevant findings of fact, and this Court adopts those findings here:

The City of New Bedford owns and operates the Buttonwood Park Zoo, an institution accredited by the Association of Zoos and Aquariums.  The Buttonwood Park Zoo owns two Asian elephants, Emily and Ruth.  Asian elephants are an endangered species.

In April 1968, when she was four years old, the City purchased Emily from the Mendon Animal Farm, and transferred her to the zoo.  Emily was a healthy, young elephant at the time of

---

[1] The docket number for the related case is 17-cv-11809-WGY.

[2] The amended complaint also sought a declaratory judgment stating that the City's treatment of the two elephants violated section nine of the ESA (Count 7).  (*Rowley I*, Am. Compl. ¶ 134).

the City's purchase.

Ruth was delivered into the City's care at approximately 28 years old after being rescued by the Animal Rescue League of Boston and seized by the United States Department of the Interior.  While she was once owned by Benson's Animal Farm in New Hampshire, she was found abandoned in 1986 in a truck on a dump site in Danvers, Massachusetts.  A United States Department of the Interior report from the time she was seized indicates that Ruth suffered from the following issues, among others:  her ear condition was fair, with one hole and ragged edges on each ear; her skin condition was fair to poor; her tail and skin had an extreme build-up of necrotic tissue; she had scars on her legs (indicative of excessive chain wear) and chin (more than twenty hook scars); she had partial trunk paralysis; and she was underweight.

At the time of *Rowley 1*, Emily was 55 years old, and Ruth was approximately 61 years old.  They were among the oldest living Asian elephants in a zoo setting in America.  Indeed, the average life expectancy for Asian elephants in captivity in North America is 44.8 years.  Aside from a brief period from November 1983 to July 1985, Emily at the time of *Rowley 1* had resided at the Buttonwood Park Zoo for 49 years of her 55 years, and Ruth had resided at Buttonwood Park Zoo for 33 years.

As of September 2019, the court found that the City had supported its zoo with an adequate budget; had attracted a cadre of dedicated, professional, empathetic, and innovative zookeepers; and had employed top-notch veterinarians wherever necessary.  In addition, the court found that the pace of change at the zoo was commensurate with the evolution of elephant husbandry.  Hydraulic fences lined the elephant stalls within their barn, allowing the elephants to move in accordance with zookeepers' desire without the need for bullhooks.  The barn's concrete floor was covered with thick sand (which is easier on the elephants' feet), and sand was banked

up against one wall of each stall so the elephants could lean against the sand banks rather than

kneeling and lying down (which is more difficult for geriatric elephants with aging joints).

Outside, forage was made available not only on the ground but on a raised, lattice-like wooden

structure in order to replicate the elephants' natural environment and encourage them to exercise

their trunks.

In 2019, the court also considered whether Ruth and Emily engaged in stereotypic

behaviors, or behaviors with no purpose, which can indicate a captive animal's mental stress.

The court found that while plaintiff suggested that they engaged behaviors such as swaying,

bobbing, and pacing, she failed to prove that those behaviors were stereotypic.  Moreover, she

did not prove that the City's action or inaction caused the behaviors that she described as

stereotypy.

### 2.    Rulings of Law in *Rowley I*

Based on the evidence presented during the March 2019 bench trial, Judge Young

determined that the City had not violated the ESA.  *See Rowley I*, 413 F. Supp. 3d at 67.  The

court held that the City had provided care that complied with the Animal Welfare Act and

generally accepted veterinary practices, and had neither harmed nor harassed the elephants; that

the food and shelter provided by the City was consistent with generally accepted animal-

husbandry practices and did not harm or harass the elephants; that there was insufficient

evidence to establish the likelihood of a significant disruption of normal behavioral patterns; and

that plaintiff had not proved that the City harmed or harassed Ruth by negligently allowing

Emily, the larger of the two elephants, to attack her.  *Id.* at 64-67.

### B.    Procedural Background

Approximately two years after judgment entered for the City in *Rowley I*, plaintiff

commenced the present action ("*Rowley II*"), alleging that there had been "substantial changes"

at the zoo since 2019.  (*See* Am. Compl. at 1).[3]  Specifically, the amended complaint asserts that the facilities housing the elephants have become "dilapidated" and that the management of the facilities and elephants has changed, resulting in the elephants developing pododermatitis.  (*Id.*).  It further alleges that since the judgment in *Rowley I*, Ruth has lost "[t]wo of her toe bones in her left foot" and has been restricted from moving, eating, and drinking.  (*See id.* ¶¶ 24-25).  As in *Rowley I*, it asserts violations of the ESA and seeks declaratory and injunctive relief.  (*See id.* ¶¶ 77-84).[4]

The Court held a bench trial in *Rowley II* on May 13, May 14, and May 22, 2024.  At the close of the trial day on May 22, plaintiff was on the witness stand.  Her direct testimony and cross-examination had been completed; all that remained of her case was an opportunity for redirect examination (and recross, if necessary).  During cross-examination, plaintiff became increasingly agitated and disputatious.  Among other things, she accused a City employee (and prospective defense witness) of taking a photograph while she was testifying.  The Court was also informed that plaintiff and counsel for the City had engaged in a heated dispute after the trial was recessed for the day.

The parties planned to hold the fourth day of the bench trial on May 23, 2024.  The anticipated proceedings for May 23 were to conduct the redirect and recross of plaintiff and to

---

[3] Because more than two years had elapsed between the closing of *Rowley I* (October 4, 2019) and the filing of *Rowley II* (October 8, 2021), the matter was not assigned to Judge Young as a related case under Local Rule 40.1(g)(4).

[4] Specifically, the amended complaint seeks a judgment (1) declaring that defendant's treatment of both elephants violates the Endangered Species Act; (2) enjoining defendant from euthanizing either elephant; (3) enjoining defendant from continuing to violate the ESA; (4) enjoining defendant from continuing to possess either elephant; (5) enjoining defendant from transferring either elephant to the Buttonwood Park Zoological society, or to any other public or private zoo; (6) allowing plaintiff's veterinarian(s) to inspect both elephants in the barn; (7) transferring both elephants to plaintiff to be transported to an elephant sanctuary; (8) awarding transport costs to plaintiff; (9) allowing plaintiff to attend the necropsy and awarding plaintiff either elephant's remains should either die at the zoo; and (10) granting any other relief as may be equitable.  (Am. Compl. ¶ 84).

begin the defense case.  Plaintiff indicated that she intended to rest after her testimony, and defendant indicated that it would move at that point for a directed verdict.  The Court instructed both parties to be prepared for that likelihood and the possibility that the motion for a directed verdict would be denied and the defense case would begin.

Instead, at 6:42 a.m. on May 23, plaintiff sent an e-mail to the courtroom deputy stating the following:  "Please let the judge know that I will not attend court today as I do not feel I will be safe from harassment in his courtroom."  (ECF No. 191, Ex. 1).  She also filed a motion for recusal of the undersigned judge.

At 9:00 a.m. on May 23, defendant appeared for trial with a witness.  Plaintiff did not appear.  The Court held a brief colloquy with defense counsel on the record, during which it denied the motion for recusal.  The Court on May 23 also ordered plaintiff to show cause in writing why the case should not be dismissed with prejudice for lack of prosecution or, in the alternative, why she should not be deemed to have rested her case without an opportunity for redirect testimony.

In response to the show-cause order, on May 23 plaintiff filed a second motion for recusal.[5]  The Court held a status conference on May 24 with both parties.  At that status conference, the Court determined that for purposes of considering the motion for a directed verdict, it would disregard the cross-examination of plaintiff and deem that plaintiff had rested her case as of May 22.[6]

---

[5] The Court denied that motion on May 24, 2024.

[6] Defense counsel also represented to the Court during the status conference that he was able to confirm with a courtroom security officer on May 22 that the City employee accused by plaintiff of taking a photograph in the courtroom did not have a cell phone in her possession at that time.  He further reported that he accompanied the City employee to the first floor of the courthouse and watched as she retrieved her cell phone from the officers at the front desk.

On June 7, 2024, defendant filed a written motion for a directed verdict.  The Court set a deadline of June 21, 2024, for plaintiff's opposition to the motion.  Plaintiff did not file an opposition, either by the deadline or at any point thereafter.

## II.     Legal Standards

### A.     Motion for a Directed Verdict

A motion for a directed verdict in a bench trial is treated as a motion for judgment on partial findings under Fed. R. Civ. P. 52(c).  *See Northeast Drilling, Inc. v. Inner Space Servs.*, *Inc.*, 243 F.3d 25, 37 (1st Cir. 2001).[7]  "If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue," Rule 52(c) allows the court to "enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 52(c).  A court should enter a judgment under Rule 52(c) only "[w]hen a party has finished presenting evidence and that evidence is deemed . . . insufficient to sustain the party's position."  *Morales Feliciano v. Rullan*, 378 F.3d 42, 59 (1st Cir. 2004).  "In deciding whether to enter judgment on partial findings under Rule 52(c), the district court is not required to draw any inferences in favor of the non-moving party; rather, the district court may make findings in accordance with its own view of the evidence."  *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006); *see also Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 963 n.1 (5th Cir. 2016).

---

[7] Here, defendant incorrectly moved for a directed verdict pursuant to Fed. R. Civ. P. 50.  (*See* ECF No. 98, 1).  Rule 50 does not apply to bench trials.  Instead, Rule 52(c) is the "proper vehicle for rendering judgment."  *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 963 n.1 (5th Cir. 2016); *see also Rego v. ARC Water Treatment Co. of Pennsylvania*, 181 F.3d 396, 401 (3d Cir. 1999) (noting that "Rule 50(a) applies in jury trials and Rule 52(c) applies in non-jury trials"); *Northeast Drilling, Inc. v. Inner Space Servs., Inc.*, 243 F.3d 25, 37 (1st Cir. 2001) (explaining that "[b]ecause the trial was heard without a jury, [the] motion at the close of [the] case should have been characterized as a motion for judgment on partial findings under Fed. R. Civ. P. 52(c)" instead of Rule 50).

B.      **The Endangered Species Act and the Animal Welfare Act**

Congress enacted the Endangered Species Act, 16 U.S.C. §§ 1531-1544, to (1) "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," (2) "provide a program for the conservation of such endangered species and threatened species," and (3) take appropriate steps to carry out the commitments of the United States in various international treaties and conventions concerning species conservation.  16 U.S.C. § 1531(b).

The ESA makes it illegal for a person to "take" any endangered species.  16 U.S.C. § 1538(a)(1)(B).  The Supreme Court has held that Congress intended the word "take" to cover "every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995) (quoting S. Rep. No. 93-307, at 7 (1973)).  This prohibition thus reaches "more than the deliberate actions of hunters and trappers."  *Id.* at 705.

The ESA itself defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19). Here, plaintiff's claims rely on the prohibition on harassing and harming endangered species. (*See* Am. Compl. ¶¶ 63-75).

The Fish and Wildlife Service, the agency tasked with implementing the ESA, *see* 16 U.S.C. § 1537a(a), has promulgated regulations defining the terms "harm" and "harass" under the statute.  Under those regulations, the term "harm" is defined (as part of the definition of "take" in the ESA) to mean:

> [A]n act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3; *see also Babbitt*, 515 U.S. at 703 (deferring to regulation's interpretation of

"harm") (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

> The term "harass" is defined (again, as part of the definition of "take") to mean:

> [A]n intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering.

50 C.F.R. § 17.3.  That definition includes a carve-out that exempts the following:

> generally accepted:  (1) [a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act, (2) [b]reeding procedures, or (3) [p]rovisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to . . . result in injury to the wildlife.

*Id.*

The Animal Welfare Act, 7 U.S.C. §§ 2131-2159, sets standards for the humane care and

treatment of "animals intended for use in research facilities or for exhibition purposes or for use

as pets," among other goals.  *Id.* § 2131.  To implement the law's protections, the Department of

Agriculture ("DOA") promulgates regulations that set standards for facilities and care of animals

in captivity.  *See, e.g.*, 9 C.F.R. § 2.40 (setting standards for veterinary care for animals owned

by exhibitors or dealers); 9 C.F.R. §§ 3.125-3.142 (setting standards for the "handling, care,

treatment, and transportation of warmblooded animals other than dogs, cats, rabbits, hamsters,

guinea pigs, nonhuman primates, and marine mammals").

In sum, a defendant commits a "taking" of wildlife that violates the ESA if its conduct

"actually kills or injures" an animal.  *See* 50 C.F.R. § 17.3.  A defendant also commits a

prohibited "taking" if it "creates the likelihood of injury to wildlife by annoying it to such an

extent as to significantly disrupt normal behavioral patterns" unless the conduct is a generally

accepted animal-husbandry practice that complies with the Animal Welfare Act.  *See id.*

**III.     Analysis:  Findings of Fact and Conclusions of Law**

The question in this case is whether the City has harmed or harassed the elephants within the meaning of the Endangered Species Act since Judge Young's 2019 decision in *Rowley I*.

As noted, plaintiff's evidence at trial focused in large part on whether elephants should be kept in zoos at all.  An expert witness for plaintiff, Dr. Bob Jacobs, testified that "all zoos provide an impoverished environment for larger mammals such as elephants," and that "[t]he zoo environment cannot provide anything resembling the natural environment that elephants need to thrive."  (Trial Tr. May 14 at 5, 8).  Sanctuaries, on the other hand, "provide a much more natural space."  (*Id.* at 5).  On cross-examination, Dr. Jacobs stated that it was "correct" that "no zoo . . . could meet the standard that [he] would like to see for elephants" and that "[e]lephants should not be held in captivity."  (*Id.* at 20).

The evidence indicates that placing elephants in sanctuaries is not a simple matter.  Carol Buckley, who started two elephant sanctuaries, testified that a successful sanctuary requires large amounts of land, good climate, gentle topographic variation, and a positive social dynamic between the resident elephants.  (Trial Tr. May 22 at 14-18).  For example, she testified that even though there is enough land in her Georgia sanctuary to support more elephants, she is not currently planning on expanding because the three current elephants are getting along so well.  (*Id.* at 23).

Testimony at the trial also suggests that it is difficult to transport elephants to sanctuaries, or indeed over any long distance. Dr. Erica Lipanovich, a veterinarian who cared for Ruth and Emily at the Buttonwood Park Zoo from March 2019 until May 2022, testified that preparing healthy elephants for a four-hour drive could take about a year.  (Trial Tr. May 14 at 44).  She testified that elephants that are frail are not good candidates for sanctuaries because the risks of transporting them are too high.  (*Id.* at 45).

The relevant question in this case, however, is not whether Ruth and Emily would be better off living in a sanctuary.  Rather, it is whether the Buttonwood Park Zoo is harming or harassing the elephants in violation of the ESA.

The ESA, in conjunction with the Animal Welfare Act, clearly contemplates that endangered species may be kept in captivity.  *See* 50 C.F.R. § 17.3 (creating an exception from the definition of "harass" that applies to "captive wildlife"); 7 U.S.C. § 2131 (explaining that the Animal Welfare Act is designed to "to insure that animals intended for . . . exhibition purposes . . . are provided humane care and treatment").  The standard of care for an endangered species in captivity is not a goal requiring the least restrictive environment or the most natural possible setting.  Rather, it is generally accepted and appropriate animal husbandry.  *See* 50 C.F.R. § 17.3.

Thus, in order to establish whether the City has harmed or harassed the elephants at the zoo since 2019, plaintiff would need to show at least one of the following:  (1) that there has been a material change in generally accepted elephant-husbandry practices, (2) that there has been a material adverse change in the City's elephant-management program, or (3) that there has been a material adverse change in the manner in which the City implements its elephant-management program.

At trial, plaintiff did not present any evidence, expert or otherwise, to establish that generally accepted elephant-husbandry practices have changed in any way since 2019.  Plaintiff also did not present any evidence, expert or otherwise, to establish that there have been any changes in the City's elephant-management program since 2019.  Finally, plaintiff did not present any evidence that there have been any material adverse changes in the manner in which the City has implemented its elephant-management program since 2019.

12

Instead, plaintiff herself suggested that Ruth and Emily ought to be transported to an elephant sanctuary for three primary reasons:  (1) Ruth has allegedly lost one or more toe bones due to conditions at the zoo; (2) Ruth has sores on her body due to conditions at the zoo; and (3) Ruth is experiencing a condition called "learned helplessness."  (Trial Tr. May 14 at 17).  As set forth below, however, plaintiff failed to provide sufficient evidence to establish any of those claims.

A.    **Findings of Fact**

1.    **General Findings Concerning the Elephants**

Ruth and Emily are kept in an enclosure that includes a barn, an inner yard with a large pool, and an 8,000 square-foot outer yard.  (Trial Tr. May 13, 138).  The barn has two stalls, is lined with natural substrate, and is cleaned daily by a team of keepers.  (*Id.* at 152).  The elephants' keepers rely on positive reinforcement and voluntary compliance to care for them. (*Id.* at 147-48).  Zoo staff members also monitor video footage of the elephant enclosure 24 hours a day to detect emergencies or issues.  (*Id.* at 66).

From at least 2019 to the present, the City has employed a full-time on-site veterinarian at the Buttonwood Park Zoo.  (*Id.* at 27; *Id.* May 14, 10).  That veterinarian visits Ruth and Emily at least once per day, every day.  (Trial Tr. May 13, 42; *Id.* May 14, 19).  In addition, Ruth receives various treatments on a daily basis and sees elephant specialists as needed.  (Trial Tr. May 13, 42-43, 93; *Id.* May 14, 14-16; 35-36).

2.    **Whether Ruth Has Lost Toe Bones Due to Conditions at the Zoo**

Plaintiff first contends that Ruth has lost one or more toe bones due to conditions at the zoo.  She testified that she "observed" that "Ruth began to have a foot issue called

pododermatitis by April 2021." (Trial Tr. May 22, 56).[8]  She further testified that around that

time, Ruth began to lose bones in her toes.  She alleges that she learned that Ruth was losing toe

bones when she obtained radiographs of Ruth's feet through a Freedom of Information Act

request.  (*Id.* at 61).  According to plaintiff, those radiographs were "self-explanatory" and

"anybody looking at them would make the same conclusion" that Ruth had suffered bone loss.

(*Id.* at 62).  Moreover, she implied in her testimony that the bone loss was caused by an infection

stemming from waste-contaminated soil or, as she noted in her opening statement, either "poor

foot management" or "no foot management" from veterinary staff.  (*Id.* 70-71; Trial Tr. May 13,

8).

      Plaintiff failed, however, to prove that Ruth lost any bones in her toes.  She is neither a

veterinarian nor a radiologist, and therefore is not qualified to interpret radiographs of an

elephant's foot.  Moreover, three witnesses—two veterinarians who have treated Ruth personally

and one veterinary radiologist who has interpreted Ruth's radiographs—explained at trial that the

seemingly absent toe bones were simply not captured on certain radiographs due to the

difficulties inherent in conducting imaging tests on large animals.  Indeed, one of those

witnesses—Dr. Emily Budas, the current staff veterinarian at the Buttonwood Park Zoo who

cares for Ruth and Emily—testified that Ruth's toe bones have since "re-appeared" on more

recent radiographs due to the zoo's implementation of new imaging techniques.  (Trial Tr. May

13, 57)

      As Dr. Budas stated at trial:  "Based on what I see today I do not believe Ruth is missing

any bones in her feet."  (*Id.* at 56).  She also testified that "[b]ones do not grow back," and "[i]f a

---

[8] According to witness Dr. Emily Budas, the staff veterinarian at the Buttonwood Park Zoo, pododermatitis can be defined as "inflammation of the foot, specifically of the skin of the foot."  (Trial Tr. May 13, 42, 87).

bone is gone; a bone is gone." (*Id.* at 55).  When asked, then, why it might have appeared as though Ruth was missing bones, Dr. Budas explained that she did not "believe the full image of her foot was obtained at that time." (*Id.* at 57).  In other words, the bones were present, but simply "not present in the image." (*Id.*).  Currently, the zoo uses a new imaging technique that involves better "positioning of the foot as well as the plate as well as the generator that's used to take the image." (*Id.* at 58).  As a result, Dr. Budas agreed that there have been "subsequent radiographs that do appear the show the bone." (*Id.* at 57).  Similarly, Dr. Lipanovich testified that the appearance of bones on radiographs can be "very dependent on radiographic technique and positioning." (Trial Tr. May 14, 14, 33).  Radiographs can also become "fuzzy" when there is inflammation in the areas being imaged.  (*Id.* at 14).

Dr. Eric Hostnik is the "primary radiologist for a zoo-focused radiologist consultation . . . service," an "associate professor with tenure at Ohio State University 's College of veterinary medicine," and the "Editor in Chief for . . . the scientific journal for the American College of Veterinary Radiology."  He agreed with both Dr. Budas and Dr. Lipanovich.  (Trial Tr. May 22, 51-52).  He noted that "it's very common" for "soft tissue [to] block the view of a bone" or "impede your ability to see the digits," especially in areas of the body with "proliferative tissue." (*Id.* at 60, 67, 72).  Dr. Hostnik also explained that different imaging techniques often produce different results.  He stated:

> If you were to take a radiograph or put a flashlight on your hand and go right at the palm, you would see one thing projected.  If you were to then rotate that flashlight off to the right or left, your shadow changes, so being able to evaluate different margins doesn't necessarily mean that a pathology is different, it just means we're seeing different aspects of it.

(*Id.* at 87).  Dr. Hostnik also highlighted the general difficulties that veterinarians face when working with animals, testifying that "whether it's a horse or a dog or an elephant, it's a real-

time thing, if people's safety is at risk, a lot of times you take the radiograph and you're not sitting critiquing it to the degree we are right now." (*Id.* at 69).  He noted that imaging techniques change over time, and it is not surprising that "it would take more than one event to get a good technique for working with an elephant." (*Id.*).

Accordingly, the Court finds that plaintiff failed to demonstrate any bone loss in Ruth's toes.  Furthermore, and in any event, even assuming such a bone loss occurred, the Court finds that plaintiff has not established that the bone loss was caused by zoo conditions.  Again, she contends that the loss was caused by an infection stemming from waste-contaminated soil or inadequate veterinary care.  She provided no expert evidence, however, to support those theories of causation.

To the contrary, Dr. Budas testified that pododermatitis "actually isn't caused by an infection." (Trial Tr. May 13, 42).  She further explained that she believed that Ruth did not have an infection because there was "no evidence of pus" and no evidence of an infection in Ruth's bloodwork. (*Id.* at 44).  Dr. Lipanovich testified that even the mere presence of bacteria on a biopsy of Ruth's "external proliferative tissue" would not indicate any infection, as there is bacteria that is "normally there" and a "normal part of your skin." (Trial Tr. May 14, 19).  Instead, both Dr. Budas and Dr. Lipanovich concurred that Ruth's pododermatitis was likely caused by her geriatric age, severe arthritis, and pigeon-toed conformation. (Trial Tr. May 13, 73, 98-99; Trial Tr. May 14, 9, 35).  Based on Ruth's characteristics, the chances that she would develop pododermatitis "were very, very high." (Trial Tr. May 14, 35).

Finally, Dr. Budas and Dr. Lipanovich testified that the soil in Ruth's habitat was not unduly contaminated by waste.  Dr. Budas stated:  "Ruth eliminates three times a day . . . and I can assure you that they are always cleaned up in a timely manner." (Trial Tr. May 13, 46).  Dr.

Lipanovich agreed, noting that the staff did "an excellent job of cleaning it out multiple times throughout the day." (Trial Tr. May 14, 20).

As to plaintiff's allegation that Ruth received either poor care or no care at all for her foot, the Court finds the opposite to be the case. Ruth received consistent and high-quality veterinary care. Dr. Budas testified: "I am with Ruth every single day and I assess her every single day that I am on site." (Trial Tr. May 13, 42). Dr. Lipanovich testified that when she worked at Buttonwood Park Zoo, she "saw this elephant almost every single day for over a year . . . sometimes twice daily," even coming into the zoo on her "day off to evaluate her to make sure we were staying on top of anything that possibly could develop." (Trial Tr. May 14, 19). A number of elephant-care specialists also reviewed Ruth's foot condition, including Michael McClure, an elephant-foot expert who has worked on "hundreds and hundreds of elephants." (*Id.* at 14-15). Other "elephant expert[s]" who have either cared for Ruth's feet in person or consulted with the zoo about Ruth's feet include Ellen Wiedner, Betsy Stringer, Steve Myer, James Oosterhuis, and Dennis Schmidt. (*Id.* at 15-16).

As a result, Ruth appears to have received appropriate therapies, such as carbon-dioxide-gas therapy and canker-powder therapy, on a daily basis, as well as foot trimming and cryotherapy. (Trial Tr. May 13, 42-43, 93; Trial Tr. May 14, 35-36). Dr. Lipanovich reported that "multiple institutions have utilized [these treatments] since we started [them] with Ruth, and all of them have said that it has been incredibly beneficial for getting these lesions back under control." (Trial Tr. May 14, 35).

### 3.     <u>Whether Ruth Has Sores Due to Conditions at the Zoo</u>

Plaintiff next contends that Ruth has sores on her body due to conditions at the zoo. More specifically, she states that Ruth has "open sore[s] on her face and haunches" as a result of "dusting" in her own waste.  (Trial Tr. May 13, 81; *Id.* May 22, 64).[9]

Dr. Budas, however, testified that Ruth's sores are actually "pressure sores" that she "gets . . . from when she's laying down sleeping."  (Trial Tr. May 13, 82).  She explained that "there is not really a way to prevent them," and they are "equivalent" to the "bed sores" that a person who is "elderly or overweight" might get from "lay[ing] in bed for a long time."  (*Id.*). Dr. Budas further noted that the elephants she treated in Africa as a veterinary student had "open sores on their face[s]" and "haunches," too, even though they "were not captive elephants."  (*Id.* at 82-83).  Plaintiff offered no evidence, expert or otherwise, to support the sores were caused by a failure to follow appropriate husbandry practices.

### 4.     <u>Whether Ruth Is Experiencing "Learned Helplessness"</u>

Finally, plaintiff contends that Ruth is experiencing a condition called "learned helplessness."  She alleges that Ruth "stay[s] frozen in a spot for hours at a time" even when she would prefer to be moving.  (Trial Tr. May 22, 55).  She acknowledged in her testimony that "it's difficult to be able to provide evidence of something that is as nebulous as an elephant standing still."  (*Id.* at 52).  Nevertheless, she testified:  "I have stood for . . . up to five hours in and around the zoo . . . and have observed Ruth standing still, perfectly still for up to three hours."  (*Id.*).

---

[9] According to Dr. Lipanovich, "dusting" is a behavior that occurs when an elephant "take[s] sand and soil and grab[s] it with their trunk and fling[s] it on their bodies to act as a way to help cool them or prevent them from getting sun burned."  (Trial Tr. May 14, 22).

Plaintiff suggests that zookeepers might be giving Ruth commands to stay in place.  She testified that Ruth sometimes "appear[s] to be looking for a keeper or someone to signal her." (*Id.* at 55).  Alternatively, she proposes that Ruth stays in place because of her "learned helplessness."

At trial, Dr. Bob Jacobs, a neuroscientist and former professor at Colorado College, described learned helplessness as a condition that "happens when an animal, including a human, is in a situation where they can neither avoid nor escape that situation."  (Trial Tr. May 14, 18). As a result of the condition, "the animal basically just sits there and takes it . . . and realizes that there's no point in fighting . . . or acting out or being aggressive towards caretakers."  (*Id.*).  The animals become "broken."  (*Id.*).  In fact, Dr. Jacobs contends that "*all* zoos provide an impoverished environment for larger mammals such as elephants," and those impoverished environments lead to learned helplessness.  (*Id.* at 5) (emphasis added).

Dr. Jacobs is a neuroscientist who studies the mammalian brain.  (*Id.* at 2).  He is not a zoo expert; he has never visited the Buttonwood Park Zoo to examine Ruth; and it is far from clear whether he has produced any scientifically rigorous studies of animals in "impoverished environments."  Indeed, he acknowledges that there has been "no direct research" and it is "practically impossible, for example, to control for genetic variations in these experiments that look at the effects of enrichment and impoverishment."  (*Id.* at 15-16).  As a result, he essentially "extrapolate[s] from research on many different species."  (*Id.* at 16).

Furthermore, as Dr. Lipanovich testified, Ruth is given "free choice" at the zoo, even in the context of her medical care:

> Ruth has a decided opinion, and if she didn't want to participate, she wasn't going to.  She was given free choice, so in all of the treatments that we did, she was cooperative for and she did really well for to the point that, you know, we got it mostly resolved.

(*Id.* at 35).  Similarly, Dr. Budas explained:

> Everything that the animals do is voluntary so, again, having that positive relationship is vital.  So we ask them to perform behaviors and then if they are in the mood and compliant then they will do those behaviors for us, whether that's participating in foot care or shifting for cleaning of the barn, whatever that might be.  But ultimately it's all voluntary on the animals' part, which is why we keep that reinforced positively.

(Trial Tr. May 13, 148).

Accordingly, even though plaintiff states that "[t]here's no other explanation for Ruth just standing there," she has not proved that Ruth is suffering from a particular mental-health condition, or that the City's failure to observe appropriate elephant-husbandry practices caused the behaviors she associates with that condition.

### B.  Conclusions of Law

Under the ESA's implementing regulations, to "harm" an endangered species means intentionally or negligently to engage in "an act which actually kills or injures wildlife," and encompasses habitat modification that "significantly impair[s] essential behavioral patterns, including breeding, feeding, or sheltering."  50 C.F.R. § 17.3.  Plaintiff has put forward no evidence that the City has actually injured either of them.  It is true that the elephants suffer from occasional maladies, and that Ruth's general health has declined (in somewhat predictable ways) as she has aged.  But the plaintiff has not shown that the City has caused any of these conditions.

Under the same regulations, to "harass" an endangered species is to "create[ ] the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  *Id.* The City's actions have not significantly disrupted the elephants' normal behavioral patterns beyond merely keeping them in captivity.  (Trial Tr. May 13, 2024, 148).  But keeping an endangered species in captivity cannot be a *per se* violation of the Endangered Species Act,

because the statute's implementing regulations explicitly allow for it.  *See* 50 C.F.R. § 17.3.  As long as the City complies with generally accepted "[a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act" and generally accepted "veterinary care," it cannot be liable under the ESA.  *Id*.

The City's accreditation by the Association for Zoos and Aquariums, which sets standards for animal care above the minimum standards required by Animal Welfare Act regulations, supports the conclusion that the care and environment that the City provides the elephants are consistent with generally accepted animal-husbandry practices.  (Trial Tr. May 13, 102-107).  The City has provided generally accepted veterinary care for Ruth and Emily that complies with the Animal Welfare Act, because a qualified professional oversees them, and even consults with numerous veterinary experts from across the country.  *See* 9 C.F.R. § 2.40.  Plaintiff has provided insufficient evidence to support a finding that the zoo does not comply with generally accepted animal husbandry practices.

Accordingly, the City has neither harmed nor harassed the elephants within the meaning of federal law.  50 C.F.R. § 17.3.  Plaintiff has therefore failed to prove that the City has "take[n]" the elephants in violation of the ESA.  16 U.S.C. §§ 1532(19), 1538(a)(1)(B).

## IV.   <u>Conclusion</u>

For the foregoing reasons, the motion of defendant the City of New Bedford for a directed verdict, construed as a motion for judgment on partial findings under Fed. R. Civ. P. 52(c), is GRANTED.  The clerk is directed to enter judgment for the City.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  October 31, 2024          Chief Judge, United States District Court